ELLIS v BIBB.

In July 1819, P. as principal, with E. as security, gave their note payable in six months to B. for $3000, to bear interest at five per cent a month. In March, 1821, B. without the consent of E. at the time, entered into a new contract with P. who secured the payment of $3500 in one year and $4000 in two years, by a deed of trust on twelve negroes, and B. agreed to remit the remainder on said sums being paid. P. absconded with the negroes. In January 1822, E. under the influence of alarm and mistake as to his legal rights, consented to give B. his notes for $6,600, and received an assignment of the original note and deed of trust: both believing that five per cent a month was recoverable on the original note till paid. E. on those notes paid $4,400 and was notified by his principal not to pay more than was lawfully due on the original note, at his peril. It was held.

1st. That B. on the original note was only entitled to interest at five per cent per month till its maturity, and at eight per cent per annum afterwards.
2. That the extension of time given, released the security.
3. That the notes of E. for $6,600, were not void for usury.
4. That E. being a security, was entitled to relief in chancery against all but the balance of the original debt, computing interest at five per cent a month till due, and eight per cent per annum afterwards.

RICHARD ELLIS, in January 1826, filed in Franklin Circuit Court a bill in chancery against Thomas Bibb, for a discovery and relief, and to enjoin a judgment at law which Bibb had recovered against him. The cause at April term 1827, was by consent, submitted for a final decree on the bill, with the several accompanying exhibits, and the answer; and a decree was rendered by the presiding Judge, dissolving the injunction previously granted, and dismissing the complainants bill.

*Ellis*, assigns in this Court for error, that the decree was improper; 1st. Because he was discharged from liability as security of Pettus, by the enlargement of time given for payment without his knowledge or consent, and therefore that the note sued on was without consideration: 2d. Because the several notes given by the complainant, amount to more than was due from Pettus to Bibb, and therefore were void for usury; 3d. Because as more than principal and legal interest had been paid, the injunction should have been perpetuated.

The principal and material facts of the cause appear and are stated in the opinion delivered.

By JUDGE SAFFOLD. By the bill, exhibits and answer, it appears that William Pettus, in July 1819, and while the statutory restraints on usury stood repealed, according to the provisions of the act of 1818, executed his note to the defendant for $3,000, payable six months after date, to carry interest at the rate of *five per cent a month;*

F. Pettus and complainant also signed the note, as *securities* of said William. The consideration of the note was *Mississippi Stock*, which had been purchased several years previously at a discount of about *fifty per cent*, but which at the date of the contract between these parties was worth its nominal amount, being receivable in payment for public lands as so much cash.

Pettus, the principal, at the time of executing the note, was possessed of considerable property, and his circumstances were reputed good. Sometime after the debt fell due, the defendant instituted suit against the principal, but before service of process on complainant, in March 1821, he entered into a new contract with W. Pettus, by which it was stipulated and agreed that certain negroes therein described, (about twelve in number,) were conveyed and transferred to said defendant and Daniel Coleman, to secure the payment of the debt and interest aforesaid: and on the condition, that if Pettus should pay to the defendant $3,500, within twelve months from the date thereof, and $4,000 within two years, in good current bank notes, the defendant would accept the same, and remit the residue that might be due, and the deed should become void; but if Pettus should fail to make payment as aforesaid, said Coleman as trustee should, upon the first failure to pay, take possession of the negroes-and sell them, or so many thereof as should be sufficient to pay said *note and the interest then due thereon*, at public auction, &c. The defendant also as a consequence of this contract, dismissed his suit against Pettus.

It does not appear that complainant was consulted in relation to this contract at the time it was entered into, or at any time previously, or that he had ever consented to any extension of the term of credit to the principal. The complainant charges that he was then absent in a remote part of the state, without the means of knowing, much less of consenting to the same; but that afterwards at Cahawba, the defendant informed him of the arrangement he had made, and asked complainant if he was satisfied with it; to which complainant agreed, and said he was glad of it. He further states that he was induced to make this reply from a conviction entertained at the time, and since, that he was thereby discharged from all liability as security to the note; in as much as defendant had of his own accord taken other security, extended the term of credit, and dismissed his suit; nor would he ever have entered into a contract or compromise to the contrary, but for the influence of counsel he

afterwards received, and the alarm excited in his mind from the rapid accumulation of interest, in addition to the amount of the original debt. The bill also charges various importunities and advice intruded upon him by the counsel of the defendant, urging him to the compromise, after his discharge as aforesaid; in consequence of which, together with the advice of an attorney consulted by him, and in whose opinion he had great confidence, he was induced to accede to the terms proposed, and executed his several notes to the defendant, for sums making together $6,600, which was 800 or 1,000 dollars less than he at first insisted on as being due him on his original note. It is further stated, that pursuant to the terms of the compromise, said original note, and the deed of trust from Pettus, were by the defendant assigned to the complainant, without recourse on the former; but which were believed to be of little or no value, as Pettus had fled to one of the Mexican states, and taken with him all the property conveyed by the deed of trust; and that the absconding of the principal debtor as aforesaid, together with the co-security, was the chief cause of the defendant's extraordinary exertions and ingenuity to get the complainant re-bound for the payment of the debt, and of the alarm and apprehensions of the latter for his own safety; whereby he was rendered more accessible to the influence of erroneous counsels. The complainant also tenders a redelivery of the note and deed of trust as described, should the Court so direct, as the terms on which he can be relieved from this contract. He further states he has paid defendant on his said notes exceeding $4,400, and exhibits the receipts; that defendant has since prosecuted suits on the residue of his notes, and recovered judgments against him for the balance promised; which exceeds, by several thousand dollars, the amount which he could ever have recovered from Pettus, or which complainant can ever recover from him, either in law or equity, more especially as he has absconded. The bill contains also a statement of chancery proceedings, by Pettus, against complainant and defendant; and a notice from Pettus to complainant, that if he made payment to defendant, it would be at his peril; with other matters, deemed immaterial to the merits; and concludes with a prayer for a perpetual injunction of the judgments at law, and such other relief as justice and equity may entitle him to.

I omit to notice the asperity of the bill and answer, with which the record is unnecessarily encumbered, giving

only the substance of the material allegations of the bill, and the admissions of the answer, express or implied.

The answer denies knowledge as to the fact whether complainant was originally bound in the capacity of security only, or otherwise; but the deed of trust exhibited by the complainant, to which the defendant is a party, and which in his answer he admits to be valid, shews that complainant was a *security* merely. Defendant admits he made the new contract with Pettus as charged, but says "he does not admit that it was without the knowledge or consent of the complainant; on the contrary he believes that it was with the full knowledge, privity and consent of the complainant; as he afterwards expressed himself to this defendant, and to others, well satisfied with the arrangement and security obtained; and also stated it would lessen his responsibility, and be a security to him as well as to the defendant, from said Pettus." He denies he ever considered the complainant released from his liability on the original note; but says, when he heard that W. & F. Pettus had absconded with all the property contained in the deed of trust, he became uneasy about said debt; and was anxious to have it better secured than it then was by the liability of the complainant alone; and with the aid of counsel, and by extending the time of payment, and abating part of the debt, he succeeded in making an arrangement with the complainant, by which he obtained his notes with personal security, &c. He admits payments made in part satisfaction of the notes, to about the amount charged in the bill. In answer to the charge, that the complainant, under the circumstances described, contracted his latter liability under a mistaken impression as to his legal responsibility, as well with reference to the amount which was recoverable on the original note, as to the question whether he was not entirely discharged by means of the new contract between Pettus and defendant, the latter responds in substance, that he cannot deny the complainant's ignorance as charged.

With regard to the essential fact, whether complainant consented to the modification of the contract with his principal, or had at the time knowledge of it, the remark is due, that in connexion with the averment of the answer that the defendant believed the complainant had full knowledge of the arrangement, and that it was made with his privity and consent, he adds the reasons for this belief; which are, that the complainant afterwards expressed him-

JULY 1829.

Ellis
v.
Bibb.

self well satisfied with the arrangement and security obtained, and also said it would lessen his responsibility, and be a security to him as well as the defendant, from Pettus. The grounds of the belief do not sustain the presumption of the complainant's privity and consent; they only prove that at a subsequent period he was not dissatisfied with what had been done, and thought his situation had been rendered more secure thereby. His absence to a distant part of the state is not denied, and the admission that the communication was made to him afterwards, sufficiently implies that it was not done before. At any rate, as complainant was not consulted on the arrangement, nor gave his consent at the time, or previous to its being entered into, be the other facts as they may, they can have no stronger operation on him than his still later contract of compromise, the effect of which remains to be considered.

On this state of facts, the Circuit Court having dissolved the injunction and dismissed the bill with costs, their decree is assigned as the cause of error.

The record and argument present the following questions: 1. In what amount were the parties to the original note bound in respect to the stipulated premium? 2. Was the complainant discharged by means of the new contract between defendant and Pettus, in which other security was taken and the time of credit extended? 3. If once discharged, was the complainant's subsequent undertaking valid against him in reference to his mistake of law, and to what extent was it founded on a sufficient consideration? 4. Was the contract of compromise usurious? 5. Can chancery entertain jurisdiction and afford relief?

1. On the first point, it is sufficient to remark that the principle adopted at the June term 1824, of this Court, in what were called the "Penalty questions," and repeatedly recognized since, has fixed a standard by which the true amount legally due, on similar contracts, is to be computed; and with which I continue to feel entire satisfaction. The rule was, that the exorbitant rate of premium as stipulated, should be allowed until the maturity of the note, where, as in this case, it had been absolutely promised from the date of the contract; but that at the expiration of the agreed term of credit or forbearance, when an extinguishment of the debt was contemplated by the contract, and the debtor became subject to the coercion of the law, with the costs of suit; and when, as forbearance was no longer agreed, the premium could not retain the protection of the

deleterious provisions of the statute of 1818, entitled "An act to regulate the rate of interest," that then the conventional premium ceased, and the common rate of interest, as established by law, should be subsequently allowed. And as to the specific consideration, whether *cash* actually loaned, a pre-existing debt, *Mississippi Stock*, or any other valuable and sufficient consideration, I hold to be perfectly immaterial; as was my opinion in the decisions referred to, and which has been strengthened and confirmed by subsequent examination and reflection.

2. The next question relates to the effect of the new contract between the defendant and principal debtor. The assumption of the fact is conceived to the well authorized from the bill and answer, that the other security was taken, and the term of credit extended, by instalments of one and two years, without the knowledge or consent of the complainant, who was bound only as security.

The doctrine is believed to be well established on principle and authority, that debtors, especially securities, can only be bound by the terms of their contracts, whether express or implied; that the responsibility of a security cannot be materially varied without his privity and consent; his safety may especially depend on the limited term of credit to which he has assented. If, when the debt falls due, the creditor be disposed to grant passive indulgence, should the security believe his principal in failing circumstances, and that delay in prosecuting the debt would tend to his prejudice, the law has provided means to which he can resort for greater safety; but if the creditor has surrendered the dominion of his debt by extending the term of credit, the security is thereby deprived of the means of relief, and the debtor, during the extended term, is placed beyond the reach of either creditor or security.

The principle that such circumstances will operate as a discharge of the security is maintained by Lord Loughborough, in *Kees v. Berrington.*[a] In that case, he said such interference with the contract constituted a breach of the security's obligation in honor and conscience, as well as in point of law; and refused to inquire what injury might result to the security, for that, he said, would lead to a vast variety of speculations on which no sound principle could be built. In the case of *Rathbone v. Warren,*[b] the authority of the above stated case was acknowledged, and a similar decision made. The circumstances were a little dissimilar, but the principle is the same. The relief sought

a 2 Vesey Jr. 543.

b 10 John. 587.

JULY 1829.

Ellis
v.
Bibb.

for was in favor of the bail, where the creditor, having obtained judgment, contracted with the defendant, by a written agreement, that he would not issue execution against him for the purpose of fixing the bail until after a certain day; there, actual injury would have resulted to the security, in consequence of the defendant's going to sea before the day on which execution could issue; but the decision did not rest alone on the actual injury; it recognized the broad principle, that if an obligee does any act to the injury of the surety, or varies the terms of the obligation, or enlarges the time of performance, without his consent, the surety will be discharged. In that case, it was contended in argument, that the law does not extend the same degree of protection to bail that it does to securities; the converse of the proposition has perhaps never been contended for; the Court, however, held that there was no difference.

In the case of *Comegys & Pershouse v. Cox & Harris*,[a] this Court acted on the same rule, and discharged a security under circumstances less favorable to relief than the present case. This doctrine is believed to be so well established at the present day, as to render a particular review of the various adjudications upon it unnecessary. And from the facts as presented in this case, injury, if material, may well be supposed to have resulted from this extension of credit, as the debtor, during the time, absconded with his property. Whether he would otherwise have risked the attempt, or could have succeeded if he had, is equally uncertain. But it is, at most, sufficient that he eluded justice, under a state of the contract entirely favorable to the effort, and to which the security had not given his consent.

a 1 Stewart's R. 262.

3. I am next to examine the validity or equitable effect of the complainant's compromise, after he had been discharged from liability on the former contract by reason of the unauthorized alteration of its terms by the payee. The attitude in which the complainant stood, was peculiar in the extreme. The extension of the term of credit, without his knowledge or consent, had absolved him from all legal obligation to pay any thing. If the alteration of the terms of the contract had a necessary tendency to increase his liability, he was also discharged from all the moral obligation. But I think it a fair presumption, that at the time of entering into the arrangement, the defendant supposed its tendency would be to make the debt more secure, at least against the principal; and that the complainant afterwards, qut previous to the absconding, on being informed what

had been done, entertained the same opinion. This conclusion is warranted from the language of the bill and answer on this branch of the case.    Hence I am of opinion that a sufficient moral obligation existed in this case, to sustain a subsequent promise to pay the true amount of the defendant's debt.    It is also worthy of remark, that this original debt had been contracted under a statute *sui generis*, and which had not at that time received the same judicial exposition that has since been given it, so that the amount due depended on principles of construction which were novel and difficult; and which have since been] so established as to allow on contracts of the kind much less than at that time had been allowed in private settlements, or held to be due by the decisions of the Circuit Courts.

Under these circumstances, and the advice and persuasions of counsel employed by himself and the defendant, he became fearful of his responsibility, contrary to what he says were his former impressions as to the effect of the alteration of the contract; and this influence, together with the consideration of the assignment of the original note and deed of trust, induced him to give his notes for the sum mentioned, which was less than the defendant contended was due on the original contract.    The probable value of the note and deed of trust deserves slight notice, as they contribute to the singularity of the transaction.    That the complainant could never have sustained an action on the note against any one after it was thus discharged, is believed to be true, as contended in argument.    The discharge of the debt by giving notes for it, and the assignment to one of the payors, was, in legal acceptation, a satisfaction of the original note.[a]    Nor was the deed of trust an instrument legally assignable, especially after the debt which it was intended to secure had been satisfied; even by the security. It could convey no legal title to the property to the complainant.    His interest derivable from these assignments, could amount to nothing more than an equitable demand against Pettus, to be prosecuted, if at all, in a foreign government.

But it is contended the complainant entered into this contract with a full knowledge of all the facts; that it was in the nature of a compromise of a doubtful right, fairly stipulated between the parties; that if there was any hardship, disappointment or mistake as to the inducement or consideration of the compromise, it proceeded from ignorance of the law, and as each one is charged with a knowl-

a Tindall v.
Bright.
Minor's Ala.
Rep. 103.

edge of the law, no relief can be afforded on that ground. If the general rule to that effect, the existence of which I admit, be applied to this feature of the case, yet it must be remembered, as a rule of law equally established, that if any one, either with or without a correct knowledge of the law, enter into an executory contract, without consideration; or, if the consideration fail, wholly or partially, defence at law may be made, or relief in Chancery may be had, according to the circumstances, and as the justice and equity of the case may require. The general proposition is also true, that if property be contracted at a fixed price, without warranty or deceit in the vendor, no ordinary inadequacy of price can entitle the vendee to relief; yet it may be so gross and unconscientious, as to exhibit internal evidence of unfairness, and vary the principle. And in cases where property has been sold, the chief objection to such relief is, that the owner of the property has a right to fix his price at discretion, and retain the ownership until another is willing to give it; and when this is promised, and the contract executed in *good faith,* justice as well as law, forbids a reduction of the price according to the estimate of witnesses, or of any tribunal.

This case is so far different, that the object of the contract was to secure the payment of a prior debt, which the creditor demanded, and threatened to prosecute against one who had been bound merely as security, and afterwards discharged by the act of the payee. The amount of the debt to be secured has been ascertained, by subsequent judicial constructions in similar cases, to have been more than $2,000 less than the sum promised. This reduced amount was the extent of the defendant's legal demand on the old note. It is all the complainant could recover of Pettus, under the most favorable circumstances; and had this contract not been made, the defendant would have retained only the note and deed on Pettus, instead of the complainant's renewed engagement.—Hence it follows, that when the complainant shall have paid the amount that was legally due on the original note, he will have paid, and the defendant will have received, all that justice or equity demands.

But the effect of the mistake in law, as to the complainant's prior liability, under the influence of which he was induced to enter into this compromise, was discussed in the argument, and deserves a slight notice. I retain the opinion, which I have long held, that as a general rule,

relief cannot be had against mistakes in law, but that the rule admits of exceptions. Such was my opinion in the decision of January 1827, in a second class of cases involving the "Penalty questions;" but for reasons I then expressed, I considered those cases as not furnishing exceptions to the rule. I am free to admit that the cases are rare, and that the circumstances should be peculiar and extreme, to authorize the interference. But an unqualified denial of the competency of chancery to relieve against *mistakes in law, under any circumstances;* and the idea on which it rests, that the responsibility is too great; the fact unsusceptible of proof; and the power of distinguishing cases of sufficient equity, from others, too delicate or difficult, is, I conceive, degrading to the judiciary of any government. Cases often occur in which it is impossible to separate the naked fact of mistake from other circumstances, either strengthening or diminishing the claim to relief; and the decisions have frequently been based mainly on the latter, allowing the mistake more or less influence in the decree. In other cases it may as often happen that the common presumption that the law was understood, cannot be sufficiently disproven; or that by varying the terms of the contract, the rights of indifferent persons may be affected, or that the equity on which the claim to relief is founded, may not be sufficient to authorize it. In cases of this kind, and many others, the maxim *ignorantia juris non excusat,* applies with great force and equal propriety. Some tribunals of respectable authority have adopted the maxim without qualification. But others of equal or higher authority, and I think with better reason, have admitted exceptions to the rule, in peculiar cases as reported; and the imagination can easily suggest other cases equally strong.

The highest recent adjudications on this question have been in the case of *Hunt v. Rousmanier's administrator,* which was twice before the Supreme Court of the United States.[a] That case is relied on in this, by the counsel on each side. The question was whether chancery would sustain a power of attorney, and set it up as a mortgage or deed of trust, after it had failed of its object by the death of the maker, and disappointed the intention of the parties to it. The circumstances were, that the intestate being debtor to Hunt, for money lent, and having, as the terms of obtaining the loan, agreed to prefer him to other creditors, and give him any kind of *lien* on his vessels that might be necessary to effect the object, they consulted an attorney, who advised

a8 Wheat.174.
1 Peters 1.

an irrevocable power of attorney, containing authority to sell the vessels, and pay the debt; and drew one accordingly, which he said would answer the purpose as well as any other instrument, and which was executed and accepted. On the first adjudication, C. J. Marshall, in delivering the opinion of the Court, examined the doctrine of mistakes in law at considerable length, and reviewed several decisions of other Courts upon it. He said, "in general, the mistakes against which a Court of equity relieves, are *mistakes in fact*. The decisions on this subject, though not always very distinctly stated, appear to be founded on some misconception of fact; yet some of them bear a considerable analogy to the one under consideration;" and which he regarded as a mistake *in law*. Among the cases relievable, he said, "were that class in which a joint obligation has been set up in equity against the representatives of a deceased obligor, who in his lifetime had received an advance of the money, and whose representatives were discharged at law. "He mentions two decisions, *Simpson v. Vaughan,*[a] *and Underhill v, Howard,*[b] in which this kind of relief has been granted; but says the Judges seem to have placed them on mistake in fact, arising from the presumed ignorance of the draftsman; and that it was not until the case of *Sumner v. Powell,*[c] that any thing was said in the decision favorable to relief on the ground of mistake in law. In that case the Court refused its aid, because there was no equity antecedent to the obligation; but intimated, that sufficient equity could have obtained the relief. The Chief Justice further remarks, "that the course of the Court seems to be uniform, to presume a mistake in point of fact in every case where a joint obligation has been given, and a benefit has been received by the deceased obligor. No proof of actual mistake is required. The existence of an antecedent equity is sufficient;" and that "the facts stated in some of the cases in which these dicisions have been made, would rather conduce to the opinion that the bond was made joint, from ignorance of the legal consequences of a joint obligation, than from any mistake in fact." He also notices the old case, of *Landsdowne v. Landsdowne,*[d] in which relief was given against a mistake in law; and says, as an authority on this point, it cannot be entirely disregarded. He furnishes the high authority of that Court, that this important principle yet remains in an essential degree unsettled. He observes, "although we do not find the naked principle, that relief may be granted on account of ignorance of

*JULY* 1829.

Ellis
v.
Bibb.

*a* 2 Atk. 33.
*b* 10 Ves. 209.
227.

*c* 2 Meriv. 36.

*d* Reported in
Mosely.

the law, asserted in the books, we find no case in which it has been decided that a plain and acknowledged mistake in law is beyond the reach of equity." Nor did that Court evince any terror at the idea of such competency. The opinion concludes thus: "we find no case which we think precisely in point; and are unwilling, where the effect of the instrument is acknowledged to have been entirely misunderstood by both parties, to say, that a Court of equity is incapable of affording relief."

On this point, the decree of the Circuit Court, denying relief, was reversed; but because the rights, of other creditors were involved, and the decree had been rendered on demurrer to the bill, the cause was remanded that the bill might be answered, and the equity of the claim ascertained.

On the latter adjudication of the same cause, the defendant having answered the bill, the state of the case was materially different; so that the effect of mistakes was not particularly considered. The Court remarked, that "the question then was, ought the Court to grant the relief which was asked for, upon the ground of mistake arising from any ignorance of the law? We hold the general rule to be, that a mistake of this character is not a ground for reforming a deed founded on such mistake; and whatever exceptions there may be to this rule, they are not only few in number, but they will be found to have something peculiar in their character." This, as a general proposition, corresponds precisely with my idea of the true doctrine.

No dissatisfaction was intimated as to the principles of the former decision of the same Court; but as many additional facts were shewn on the second trial, and it appeared that the intestate's estate was insolvent to a large amount, and under the failure of the power of attorney, rights had legally vested in the creditors generally; and as it also appeared that the power of attorney was the kind of instrument, and in the form the parties had ultimately agreed upon, and intended it should be, though its effect proved different from a subsequent event not anticipated; and because on a full view of the case, the complainant's equity was at least balanced, the Court refused relief.

I think it is sufficiently shewn, that on the question as to the effect of mistakes in law, exceptions are admitted to the general rule, in a few cases, attended with peculiar circumstances. In determining these exceptions, the chancellor can only be expected to exercise the same virtuous discrimination, sound legal judgment, and equitable discretion,

which are due from him on various other occasions, which qualify him for his office, and are necessarily connected with his high responsibilities.

From the facts of the case before us, and from the intrinsic nature of the transaction, no doubt can be entertained but that a two-fold mistake in law had a real existence; and that under its influence, the complainant was induced to enter into this contract, which he was not legally or morally bound to do, and otherwise would not have done. The extent of the moral obligation is already shewn to have been far short of the promise. And I think it has also been shewn from the facts of the case, that it is otherwise oppressive, and that one of greater peculiarity can hardly be imagined. Could even the complainant's mistake relative to the amount recoverable on the original note, and his promise to pay a larger sum on account of it, be considered as a legitimate subject for the compromise of a doubtful right, because the law governing the debt had not then been otherwise expounded, as was insisted on in argument, still the other mistake as respects his entire legal discharge, must stand on a different principle; for the law on this point is believed to have been uniform, and long understood in the same way. And though the simple fact of a mistake in law will not generally entitle a party to relief against it, I presume it has seldom been denied that such mistake, when established and connected with other equitable circumstances, does not strengthen and increase the equity, and render it more proper for relief. If, therefore, the other grounds relied on for the aid of chancery were insufficient in this case, I should be reluctant to deny its competency to relieve on the principles of the mistake, under all the circumstances of the case. And in the examination of the question next in order, I think it will be found, that the application of the maxim *ignorantia juris non excusat*, in the unqualified sense contended for by many, would have the effect to condemn this contract of compromise, and a variety of others perfectly innocent, as usurious; destroy their validity entirely, and subject the creditors to the penalty of usury.

4. The question alluded to is, was the latter contract usurious?

This is a subject which has several times been recently investigated before this Court; and particularly in the case of *Thompson v. Jones*,[a] to which it bears many marks of analogy; but this presents some apparent indications of usury which the other did not. In that case, Jones, who con-

[a] 1 Stewart's R. 556.

tracted to pay the debt of others, was under no previous obligation to pay it. His situation therefore required no forbearance. Forbearance was a necessary foundation to an usurious contract. There was no loan, nor any extension of the term of credit stipulated on the contract in favor of the original debtors. Here the complainant had been bound for the debt; and unless he was discharged, and he contracted under an impression that he was not, his situation required forbearance; and that may be considered as part of the consideration for the notes. But whether he acted under the influence of previous responsibility, the moral obligation only, the consideration of the original note and deed of trust as assigned, or all together, I have no hesitation in saying the contract was free from the taint of usury. This opinion is based on the reasons I gave in the decision of the former case, the most of which apply equally to this, and may be embraced by the general propositions, that at the time of entering into either contract, both parties acted on the conviction that a larger sum was due than the amount promised for, or in satisfaction of the original debts; that there was not in either case any device or contrivance to evade the statute of usury; and that the law governing the demand had never been expounded to the contrary; but so far as judicial decisions had gone, they had sanctioned the right to a greater amount than had been promised by either contract.

The members of the Court being at present unanimous on this point, I will more particularly notice only one branch of the argument, mainly relied on to prove this contract usurious. It is that usage or customs may and do prvail in many places, to receive extra premiums for the loan or advance of money, which premiums are currently believed by those concerned to be legal, and sanctioned by the course of trade; and where the parties are as unconcious of any violation of the statute, as they could possibly be in cases like the present; but which contracts are and have been adjudged usurious. In support of this position, cases are cited, in which, according to their custom, merchants and brokers have advanced money on agreements that the sums lent shall bear eight per cent interest, (or other legal rate,) and that a commission of, say two and a half per cent, shall also be paid for the advance. The substantial difference between cases of the description mentioned and the present, cannot escape notice. In those, it was evidently known to the parties, that instead of eight per cent, ten and a half were to be given for the loan of the

money, and there was no other consideration. The custom must have originated in a device, shift or contrivance, to evade the provisions of the statute; else the premiums would have been stipulated in the simple form of ten and a half per cent for the use of the money; and that was the substance of the contract. On this point the decisions of New-York are relied on; and with others, the case of *Dunham v. Gould,*[a] is found to sustain the doctrine; and of which I could have entertained no doubt. Illegal or vicious customs are to be abolished. The Court there held that the statute applied "to any loan of money, wares, merchandize, or other thing whatever," at more than the legal rate of interest, for the forbearance; that the parties appeared to have contracted for the purpose of raising money at a higher rate; and the fact, that the negotiation was in the form of an exchange of notes, made no difference. "If that was the object of the parties, (and the jury have so found it,) then it was a shift or contrivance to get rid of the statute of usury; and such a shift or contrivance no Court of justice can tolerate." On the effect of the custom, the chancellor remarked, "the custom of merchants is not applicable to such a case. It is not a matter of trade and commerce, within the meaning the law merchant. And if there were such a local usage in New York, it would be null and void, and could not be set up as a cover or pretext to trample down the law of the land. The money lenders throughout the country might as well set up any practice of their own, and then plead it in bar of the statute." He admitted however, on the authority of several English decisions referred to, that a reasonable allowance beyond interest, for re-exchange and remittance of the money from a distance, or for incidental expenses, or extra trouble in the particular case, and when there is no colour of usury, would stand on distict principles. And on the authority of other decisions, I would add to the latter class, a reasonable commission for the risk of securityships. From this slight review of the case cited, the want of analogy between it and the present is most obvious. Here it is not contended that any shift, contrivance or evasion entered into the contract.

Then for the reasons advanced, I must regard the complainant as one who had been discharged from liability by the alteration of the contract, and who was then contracting a fresh responsibility under an erroneous impression with respect to his prior obligation.

JULY 1829.

Ellis
v.
Bibb.

[a]16 Johnson's R. 367.

5. The concluding inquiry is, whether chancery is competent to afford relief in a case of this kind? Without entering into a particular examination of equity jurisdiction, I arrive confidently at the conclusion, that it is competent to relieve against the excess of the sum contracted; and that various considerations distinguish this case from any formerly decided by this Court, which in the argument have been supposed analogous. In this view, the alteration of the terms of the original contract by the defendant, and consequent discharge of the complainant, is a leading feature in the case. Justice and equity are strongly united in the prayer for relief against the mistakes in law, particularly on the question whether the complainant had been discharged from his former liability as security. A partial failure of consideration existed, and the principle has never been settled in this state whether in like cases common law is competent to afford relief; and chancery has often exercised the jurisdiction. I therefore, consider it a subject appropriately within chancery jurisdiction, even after judgment at law.

I think the application of the maxim *ignorantia juris non excusat*, may, on authority, be rejected from either side of this case, as before expressed. I deny its application to the defendant for the purpose of charging him with an usurious contract; and I also refuse its application, so far as it is supposed to forbid relief to the complainant against the excess of his contract beyond the consideration.

I am therefore of opinion, and in the result a majority concur, that the decree of the Circuit Court should be reversed; and that a decree be rendered by this Court, enjoining the judgments at law, except for the balance actually due on the original contract; to be ascertained according to the rule of computation as heretofore established, and herein declared; and that this relief be decreed at the cost of the complainant.

By LIPSCOMB, C. J. This case differing in its features, in my opinion, from any one of that great class of cases arising under the act of 1818, and heretofore adjudicated, commonly called the usury cases, in addition to what has been said with so much ability by my brother Saffold, I will briefly express my views on the several points presented.

A statement on the facts of the case I need not repeat, but shall proceed to inquire, how much was recoverable on

the note given by Pettus to Bibb, to which note, the complainant was one of the securities.    The note was for three thousand dollars, payable six months after date, to carry interest at five per cent per month.    By the rule laid down by this Court in 1824, on the construction of the act of 1818, Bibb could recover the amount of the note, with five per cent per month until its maturity, and then eight per cent per month, until paid.    This construction, though dissented from by some of the Judges, and by myself among others, at the time, has been acquiesced in by the Bench ever since, and I think I am not now at liberty to call its correctness in question; the amount payable on the note by this rule of computing the interest, would be the amount of the legal liability of Ellis, according to his original undertaking as the security of Pettus.    I will now inquire if he has at any time been discharged from this legal liability, and in what way.    The record shews, that subsequent to the maturity of the note, Bibb made an arrangement with Pettus, giving him further time of payment, and taking new security. If this new contract was founded on a good consideration, such as could be enforced, and without the consent of Ellis, the security, that he was discharged thereby from all liability, is a conclusion founded on principles of law, now too well established, to be doubted.    The consideration for which time was given, seems to be free from all objection; it was on obtaining what Bibb conceived to be additional or better security; and until this contract for further time was violated, Bibb could not resort to the process of the law to enforce payment.    The doctrine so clearly laid down in Fell on Collatteral Guarantees, and fully recognized by this Court, in *Comegys and Pershouse v. Cox et al.*[a] is, that if the creditor by a new contract with the principal, at any time lose the dominion of his debt, he thereby discharges the former securities.    To discharge the security however, the subsequent contract must have been entered into without his assent.    When a creditor undertakes to make a new contract with his debtor, who is principal, it is his duty to inform the security of it, and obtain his assent, if he wishes still to look to the security for the debt; if the security assents, it is easy to prove it; if he does not, it is difficult for the security to prove a negative.    It will therefore always be inferred that it was made without his assent, until the contrary is proven.    It does not appear that Ellis gave his assent, to the new contract between Bibb and Pettus, he was therefore discharged from

JULY 1829.

Ellis
v.
Bibb.

*a* 1. Stewart's
R. 262.

JULY 1829.

Ellis
v.
Bibb.

all liability as his security. The complainant, Ellis, subsequently made a promise to Bibb, founded on the original consideration, and gave his notes.

It is a clear rule of law, that if a security who has been once discharged by the act of the creditor, makes a subsequent promise to pay, with a full knowledge of all the facts that constituted his discharge, he is bound by such subsequent promise; a promise, so made, revives the former obligation. In this case it is not pretended but that Ellis was fully advised of the contract for giving further time; and he will not be permitted to say that he was ignorant that it had discharged him, and that his subsequent promise to pay, was in consequence of that ignorance. This dangerous principle is not essentially involved in the investigation of the case; but if it was, I would very promptly say far, far, be the time, when it should be acknowledged as law by the Supreme Tribunal of the State where my destiny and that of those most dear to me, had been fixed. Such a principle would open a scene of litigation, fraud and confusion, to which the imagination could conceive no parallel, and hope could prescribe no limitation. I will say then, that Ellis was bound by his subsequent promise, and that it revived his former liability; but how far that liability extended, remains to be inquired. I lay it down as a sound rule of law, that the moral obligation of a security to discharge the contract of his principal, extends no farther than his legal liability; this is an acknowledged rule in case of endorsors, and every other kind of securities; they are always held as bound in *strict juris*, and not by a moral obligation further than it is imposed on every one, to obey the law. If the holder of a bill does not use that diligence required by the law, he discharges the indorser; but if that indorser makes a subsequent promise, he revives the former liability; if, however, he pays more than by law he was bound to pay, it is at his own peril, and he cannot have recourse on the acceptor or maker, for such excess.

If Ellis, by his subsequent promise, revived his former liability, it was limited to it, and could not be extended beyond it; and should he pay more than in strict law he was bound to pay, he could have no recourse on Pettus for the excess.

I have before said, that the moral obligation of a security extends not beyond his legal liability; if a principal had made a promise to pay more than could have been recovered at law, on his original contract, the subsequent promise would

most likely, be in conformity to the orginal intention of
the parties to the contract, and in him the moral and legal
obligation would concur, and he would be bound to the
performance. This argument cannot be applied to the secu-
rity; he is not supposed to be cognizant of the original consi-
deration, nor of the intention of the parties to the contract.
This view of the different character of the obligations im-
posed, distinguishes this case from *Standifer v. M' Whor-
ter. a* The confirmation set up in that case was, that the
subsequent promise had been made by the original party,
and not by a security. If Ellis had been principal and
made the subsequent promise, it would have been analo-
gous to the case above referred to; or if Pettus had made a
subsequent note to Bibb, for a greater amount than could
have been collected from him on the original note, and
Ellis had gone security on the last, they would both have
been held liable for the whole amount; on the ground, that
it was a confirmation of the original undertaking. But if
Ellis, a security, has given his own note for a greater
amount than could have been collected from his principal,
the excess is not supported by a good consideration; and a
Court of Chancery ought to relieve him *pro tanto.* A
Court of law would have found some difficulty in scaling
the contract, as it was only a part failure of consideration;
the consideration was good, commensurate with the liabili-
ty of Pettus; but that difficulty is not encountered in Chan-
cery. It is urged that the deed of trust from Pettus to
Coleman for the benefit of Bibb, and tranferred by Bibb to
Ellis at the time the subsequent promise was made, is of
itself sufficient to support the promise as a valuable consi-
deration. This argument would have had much force in a
Court of law, and would perhaps have been unanswerable;
and this may be an additional reason why the complainant
should be heard in chancery in preference to driving him
to his defence at law. A Court of law would have felt
itself confined to the fact of the transfer of the deed at the
time the subsequent promise of Ellis was made, and might
have felt bound to call it a sufficient consideration in law
to support the promise; but a Court of Chancery is not re-
strained to such narrow limits in its inquiry; it can probe
the intention of the parties, and ascertain from the whole
transaction, whether the note was given by Ellis in pay-
ment for the purchase of the deed from Bibb or not. No
one can believe for a moment, after a full examination of
the facts, that the deed was sold by Bibb to Ellis; it was

11

Ellis
v
Bibb.

only given up by Bibb as a kind of forlorn security, out of which Ellis might possibly re-imburse himself for the money he had paid for Pettus, on the revival of the original liability. The Chancellor could not possibly believe that Ellis made his subsequent promise in consideration of the assignment of this deed; and when it is recollected that the negroes named in that deed as sold and conveyed, had been at that time run to parts unknown, beyond the jurisdiction of the United States; the idea that Ellis should have bought them, knowing all the circumstances, is altogether preposterous; and not reconcileable with the ordinary motives of human action. I am of the opinion, that the deed of trust cannot be held to be the consideration of Ellis' promise, but that the prior liability was the moving consideration; and that consequently, Bibb cannot recover more from Ellis than he was originally bound for; and that Chancery should perpetually enjoin the excess. That the decree must be reversed and rendered at complainants cost.

By JUDGE COLLIER.  Leisure has not permitted me to bestow that reflection which was desirable, upon the many questions brought to the view of the Court by the arguments, as well for the appellant as the appellee. I shall therefore forbear an expression of opinion upon many of them, and content myself with considering such points as are deemed decisive of the case, uninfluenced by the operation of others.

It would be a profitless expenditure of language to point out the vast multitude of cases in which Chancery interposes its aid.  The jurisdiction of that tribunal is extraordinary, and can only be invoked when Courts of law, by reason of their manner and principles of procedure, cannot administer full, adequate and complete relief; or where if their powers are adequate, the remedy is not well ascertained, or difficult to be made available at law.[a] It is enough to shew that it would have been difficult for the appellant to have defended himself at law; without instistuting an inquiry into the powers of such a Court, predicated upon the facts which the records exhibits.

Had the appellant have alledged in his defence at law against the action of the appellee, that the notes given by him to the appellee on the adjustment of his supposed liability as the security of Pettus, were made without consideration, he would have been met with the transfer of the note of his principal, and the deed securing its payment.

a 1 Atk. 128.
1 Vesey 331.
1 Ves. jr. 424.
2 Stra. 733.

to the appellee, as a consideration for his notes; and he would have found it difficult, if not impracticable, successfully to have counteracted them: even supposing the powers of the law Court adequate to an extension of the inquiry in every shape the defence might assume. Besides, the weight of opinion being against a defence at law for a partial failure of consideration, unless he had have shewn an entire failure, which I am of opinion he could not have done, his defence at law would, most probably, not have been entertained. Without therefore expressing an opinion upon the legal questions presented by this topic of the argument, I have no hesitation in concluding that such defence was, to say the least, doubtful or difficult at law; and hence conclude that chancery should lend its ear.

I am next brought to consider the consideration for making the appellants notes. Surely it was not the transfer of the note and deed of Pettus by the appellee. The appellee does not in his answer pretend that the moving cause with the appellant to make his notes, was that transfer. It is against the course of human dealing to suppose that he would have exchanged his own paper for that of an individual who had fled his country, leaving nothing from which his creditors could coerce a collection of their demands; an individual too, who had just given a striking manifestation of an indisposition to comply with his engagements; an individual who evinced a destitution of a correct sense of moral duty, by a failure to provide an indemnity for his security here, and had fixed his residence in a country, where, if history is to be accredited, justice then had no forum, and strict right few advocates. No, the true consideration of the appellants notes was a compromise of, his supposed liability to pay the note which he had before underwritten for Pettus; and though an application of the principles of law, as administered in such a Court, might consider the transfer of the note and deed of Pettus as a consideration; chancery, without relaxing the rules of law which obtain there, can view the facts as they really exist, and administer justice upon a more enlarged system. In its comprehensive grasp it looks beyond the letter of the contract, to ascertain if practicable, as the most unerring rule by which a correct understanding may be attained, the true state of fact, and the intention of the parties. What are the facts? The appellee held a note on William Pettus and Freeman Pettus, and the appellant as his security; in March, 1821, he gave day to the principal, on his making

a conveyance of personal property, in trust, for its payment twelve months thereafter. This arrangement between the appellee and the principal debtor, was made without the assent of the appellant. Some few months afterwards, when he was advised by the appellee of the arrangement, he seemed to be pleased, said his responsibility was diminished, but did not further consent or object to a continuance of his liability; about six months after this advice to the appellant, his principal left this State, taking with him to Texas, one of the Mexican States, the property conveyed for the security of the debt; and there, he himself has since resided. So soon as these latter facts were known to the appellee, he endeavoured to adjust with the appellant the note of his principal; and as an inducement to him to renew or acknowledge his liability, agreed to remit a portion of the excessive interest; and upon perfecting the compromise, did actually make such remission.

I am of opinion, that the indulgence given by the appellee to Pettus, discharged the appellant from all liability as his security; that the giving of time was a new contract, to which he was not a party, and therefore could not be obliged for its performance by Pettus. That the liability even of the principal himself on the original contract, was merged in the contract giving further time, or the remedy upon it thereby suspended until the expiration of the time fixed for its payment by the modified contract. As the appellee voluntarily renounced, without the appellants consent previously or simultaneously given, the right to coerce payment of the note from his principal for a time, it must, as it respects the security, be gone forever.[a]

a Comegys &
Pershouse v.
Cox&Harris.
1 Stewart's
R. 262.,
McLemore v.
Powell.
[12 Wheaton.

To determine otherwise, would be to create a liability without the consent of him on whom it is imposed. I say to create a liability, for as it has been said, the pre-existing liability was entirely extinguished by the act of the appellee; and this rule is founded upon wise reasons. If the creditor were to permit the contract first entered into to remain unsuspended in its force, he might perhaps, before the day when the modified contract was to be performed, obtain a compliance with the original, either with or without a resort to legal coercion; or if the creditor was about leaving the country, he might cause process to be executed, which would insure the amenability of his person, and consequently his property. On this point it is needless to go more into detail, the case of *Comegys and Pershouse v. Cox and Harris*, is considered as decisive.

JULY 1829.

Ellis
v.
Bibb.

The appellant being discharged by the indulgence to Pettus, what consideration was there for his notes to the appellee? If Pettus had removed himself and property beyond the reach of legal process without an effort on the part of the appellee to restrain him, the appellant would have been under no moral obligation to indemnify him to the extent of his original liability. This I say would have been the case, if this feature of the cause could be divested of all other circumstances calculated to exercise an influence on it; but the circumstance of the appellants not objecting, but rather professing, when advised by the appellee, to be pleased with the agreement with Pettus, though not constituting a promise in itself, because too equivocal in its import, is from the sense in which the appellee must have understood it, to be considered as imposing a moral obligation upon him, to the extent of his original liability; and the notes executed by him to the appellee upon the compromise are, *pro tanto,* recoverable.

A security unless discharged in the manner mentioned, or in some other way, is to be considered as continuing under a moral obligation to pay the debt of his principal; but this obligation only extends to perform the contract so far as his principal and himself were responsible upon it. The undertaking of the security is, that his principal shall perform his contract according to law. This Court having decided in June 1824, in the case of *Henry and Winston v. Thompson,*[a] that on such a note as the one underwritten by the appellant, the excessive interest was only recoverable up to its maturity, and that after that time, it drew the statute rate; I am of opinion that the appellant's liability should be graduated by that rule.

*a* Minor's Ala. Rep. 335.

I take pleasure in remarking, that this cause has been argued with distinguished ability; but while with the utmost sincerity, I make this declaration, I must be permitted to say, that many of the conclusions of the learned counsel for the appellee were founded on false hypothesis, and generated by a neglect to distinguish between the case of a principal and his security.

I concur in the conclusion of the opinion of the Court, but express no opinion on any point not embraced by this opinion.

Decree reversed and rendered.

Judge CRENSHAW presided below and did not sit.

SHORTRIDGE and GAYLE, for plaintiff in error.

HOPKINS and M'CLUNG, for defendant.